
IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BUTTE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>VICTOR MANUEL ORTEGA-YESCAS, and CARMELO ENRIQUE RUIZ-MORALES,<br><br>Defendant. | CR 19–06–BU–DLC<br><br>ORDER |

Before the Court is Defendant Victor Manuel Ortega-Yescas's Motion to Suppress. (Doc. 47.) The Court held a hearing on the motion on April 23, 2019, and the parties filed supplemental briefs on May 3, 2019. The Court denies the motion.

### BACKGROUND

Ortega-Yescas was living in Gallatin Gateway, Montana, when the Missouri River Drug Task Force (the "Task Force")[1] identified him as a person of interest in a methamphetamine distribution scheme. (Doc. 48-1 at 3.) Investigators believed

---

[1] The Task Force comprises state and federal law enforcement agents, who work to combat drug activity in seven counties within Montana. The majority of the officers on the Task Force work for state and local agencies, and the cases they work on are prosecuted in both state and federal court.

-1-

Ortega-Yescas was supplying methamphetamine to his codefendant, Carmelo Enrique Ruiz-Morales, who was in turn distributing the drug more widely. (*Id.* at 4.) Members of the Task Force applied for and received two search warrants for records associated with Ortega-Yescas's cell phone number. (*Id.* at 4–5.) From the records received, the investigators noted that Ortega-Yescas takes quick trips to Lynwood, California, driving 15 hours each way but spending only a few hours in California. (*Id.*)

Hoping to catch Ortega-Yescas after making a methamphetamine run to California, the investigators next applied for a CSLI (cell-site location information) or "ping" warrant—a search warrant to track the location of Ortega-Yescas's cell phone in real time—on December 27, 2018. A member of the task force brought the affidavit to a state district court judge, Judge John Brown, who found probable cause to issue the warrant, which was in effect for 14 days. (Doc. 48-2.) The Task Force monitored the location of Ortega-Yescas's phone during that time, but it did not appear that he took any trips out of state.

A couple of weeks later, investigators discovered that they were no longer getting updates as to Ortega-Yescas's phone location information because the ping warrant had expired. A member of the Task Force, FBI Special Agent Colin Cialella, realized then that he had accidentally requested 60 days of cell phone location monitoring within the application but 14 days within the body of the

warrant itself, which he had drafted. (Doc. 63 at 23.) Cialella called Judge Brown, and he asked for suggestions on how to correct his error and resubmit. (*Id.* at 25.) Judge Brown told Cialella to submit a supplemental application; because he was familiar with the case, the judge said that he did not need to again see the entire probable cause statement used to support the first application. (*Id.*) Cialella prepared a supplemental application per Judge Brown's instructions, explaining that an error had been made in the first application and requesting an extension of 46 days, to bring the total number of monitoring days to 60. (*Id.* at 26.) Cialella brought the supplemental application to Judge Brown, who signed the amended warrant in front of Cialella. (*Id.* at 28.)

On February 8, 2019 at 3:30 p.m., the Task Force received ping alerts revealing that Ortega-Yescas's phone was moving south. Continued monitoring showed Ortega-Yescas in Lynwood, California in the early morning hours of February 9. The Task Force contacted a Los Angeles police force, which verified that Ortega-Yescas was at the location of the Lynwood ping alert, driving a vehicle registered to Ortega-Yescas in Montana. When Ortega-Yescas returned to Montana, Task Force investigators, with the assistance of other state and local law enforcement officers, pulled him over. Officers applied for and received a search warrant to search the vehicle, where they ultimately found approximately five pounds of methamphetamine.

## ANALYSIS

Ortega-Yescas argues that the evidence found during the search of his vehicle must be excluded on two grounds. First, he claims that the ping warrant was invalid because Judge Brown lacked jurisdiction to issue the initial and supplemental warrants. Second, he contends that probable cause did not support the supplemental warrant when Cialella merely referenced, without restating, the information included in the initial application. In Ortega-Yescas's view, either deficiency necessary leads to suppression of the evidence gleaned from the physical search of his vehicle.

The Court disagrees. First, Judge Brown did not lack jurisdiction to issue the ping warrant because he was authorized to do so under Montana law, Mont. Code Ann. §§ 46-5-110 & 46-5-220, and the Task Force reasonably expected Ortega-Yescas would be prosecuted in state court. Second, the supplemental affidavit used to support the operative warrant incorporated the facts used to support the first warrant. Thus, probable cause supported the search warrant. However, even if the Court agreed with Ortega-Yescas's views of the constitutionality of the search under either theory, it would nonetheless deny the motion because suppression would neither prevent future police misconduct nor provide for just punishment for police behavior that was negligent at worst.

### I. Jurisdiction

Ortega-Yescas argues that Judge Brown lacked jurisdiction to issue a ping warrant monitoring the location of his cell phone across state lines. Ortega-Yescas contends that the search was "federal in character" and that Rule 41 therefore applies. *United States v. Martinez-Garcia*, 397 F.3d 1205, 1213 (9th Cir. 2005). Although the Court agrees that the jurisdictional requirements of Rule 41 are not met, and that the state court-issued ping warrant therefore would not survive scrutiny under the Federal Rules of Criminal Procedure, it disagrees that Rule 41 applies in the first instance.

The issue here—whether the search of Ortega-Yescas's cell phone location information was federal in character such that Rule 41 applies—is simpler than Ortega-Yescas makes it out to be. "Rule 41 applies to a search conducted by state officers pursuant to a state warrant only if the search is 'federal in character.'" *Martinez-Garcia*, 397 F.3d at 1213. "Generally, a search is federal if from the beginning it was assumed a federal prosecution would result." *United States v. Palmer*, 3 F.3d 300, 303 (9th Cir. 1993). The issue is one of fact. *Id.*

Ortega-Yescas argues that the search was federal because the goal of the search warrant was to discover when Ortega-Yescas was traveling out of state, claiming "[i]t is difficult if not impossible to contemplate any constitutional role for a state court judge in this factual scenario." (Doc. 64 at 10.) The Court disagrees.

At the time that the ping warrant was issued, officers had probable cause to believe that Ortega-Yescas was transporting drugs into Montana, but they did not know whether charges, if brought, would be prosecuted in federal rather than state court. Crimes prosecuted in state court may well involve interstate travel—of course, Montana law prohibits possessing and distributing controlled substances that often come into the state from elsewhere. *See* Mont. Code Ann. §§ 45-9-101, 45-9-102, & 45-9-103. Although Cialella, the only federal agent on the Task Force, was heavily involved in the warrant application process, his involvement was driven by practical circumstances rather than the likelihood of federal prosecution—he was the unlucky member of the Task Force assigned to staff the office over the holidays. His work on the case before the search was "mere participation," and it does not render the search federal in character. *Palmer*, 3 F.3d at 303 (quoting *Byars v. United States*, 273 U.S. 28, 32 (1927)).

City of Bozeman Police Officer Scott Vongehr, another member of the Task Force who worked on the case extensively before taking the holidays off, testified that he expected the case to land in state court because the Task Force "never know[s] where it's going to go." (Doc. 63 at 8.) Cialella explained further,

> everything we consider a state case until it goes federal. . . . ["Going federal"] would be a discussion with an AUSA, with everyone in the task force. And then I usually—it would be like submitting [documentation that] gets sent out to everyone in the AUSA's office and then it gets approved to where it gets assigned to a U.S. Attorney and at that point I guess a case is opened on their end. . . . [Even then,]

-6-

at some point this case may not make the federal threshold and may still go state.

(Doc. 63 at 30.) The officers testified that the offense conduct would have been prosecuted in state court had a substantially smaller quantity of methamphetamine been involved. And, although it may seem unlikely that a defendant would travel 15 hours to get a small amount of methamphetamine, the Task Force had "seen where people have gone that quick of a trip out of state to different places and come back with a very small amount. So [investigators] never know what to expect." (*Id.* at 39.)

The Court finds that the search of Ortega-Yescas's cell phone location information was not "federal in character." Knowing what we know now—that five pounds of meth would be seized when Ortega-Yescas returned to Montana—it makes pragmatic sense that this case is now in federal court. But the members of the Task Force making the decision were reasonably unaware that Ortega-Yescas would ultimately be prosecuted under federal law. Indeed, if the U.S. Attorney's Office had passed on this case, Ortega-Yescas would almost certainly be prosecuted in state court using the same evidence.

Nonetheless, Ortega-Yescas contends that the search is necessarily federal under *United States v. Henderson*, 906 F.3d 1109 (9th Cir. 2018), and *Carpenter v. United States*, 138 S. Ct. 2206 (2018). In *Henderson*, the Ninth Circuit addressed the constitutionality of a warrant issued by a federal magistrate without jurisdiction

under Rule 41. *Id.* at 1117. Ortega-Yescas argues that *Henderson* "supports the contention that Rule 41 sets the contours of the real-time CSLI terrain" and that the warrant here did not comply with Rule 41, which only provides authority for federal magistrates to issue warrants for persons or property outside the district of issuance. (Doc. 64 at 5.) However, while it is true that the Court interpreted Rule 41 in *Henderson*, which involved using digital intelligence to locate unlawful activity, *Henderson* is wholly indifferent to the question of when Rule 41 is implicated in the first instance.

Ortega-Yescas similarly relies overmuch on *Carpenter*. It is true that, as Ortega-Yescas states, the Court in *Carpenter* held that the Fourth Amendment protects individuals' privacy interests in cell phone location data. 138 S. Ct. at 2217. But the Fourth Amendment applies to *all* searches, and a federal magistrate is not needed to issue all search warrants despite the federal constitutional rights implicated. Rather, the issue discussed in *Carpenter* is the necessity of obtaining a warrant supported by probable cause in order to monitor historical cell phone location information, not the authority of a state court judge to make that probable cause determination.

The Fourth Amendment does not delineate between the authority of federal and state court judges to issue warrants. *See Stone v. Powell*, 428 U.S. 465, 493 n.35 (1976) (rejecting the "argument . . . that state courts cannot be trusted to

effectuate Fourth Amendment values through fair application of the rule"); *see also United States v. Artis*, 919 F.3d 1123, 1130 (9th Cir. 2019) ("Even if . . . a violation [of California law] occurred [when federal agents executed a state search warrant], the warrants would still be valid under the Fourth Amendment."). True, the Ninth Circuit has held that "a warrant purportedly authorizing a search beyond the jurisdiction of the issuing magistrate judge is void under the Fourth Amendment." *Henderson*, 906 F.3d at 1117. Here, though, Ortega-Yescas's argument that the search warrant is void for lack of jurisdiction is premised in Rule 41, and Rule 41 does not apply.

In the alternative, even if the search had been federal in nature, Rule 41 would still not apply because the rule, by its own terms, "does not modify any statute regulating search or seizure, or the issuance and execution of a search warrant in special circumstances." Fed R. Crim. P. 41(a)(1). The Stored Communications Act, 18 U.S.C. §§ 2701–2713, outlines the jurisdictional requirements for ping warrants.² *See United States v. Bundy*, 195 F. Supp. 3d

---

² Ortega-Yescas makes much of the fact that the warrants cited to § 2703(d), which does not set forth the requirement for warrants but rather court orders. In *Carpenter*, the Stored Communications Act was considered and found to be inconsistent with the Fourth Amendment to the degree that it sets forth a lesser standard than probable cause for court orders compelling disclosure of cell phone location information. 138 S. Ct. at 2223. Here, the warrant was clearly that—a warrant, supported by probable cause. While the Task Force may have erred in citing to subsection (d) in the body of the warrant, the state court issued a warrant—not merely a § 2703(d) order—and there is no dispute here that probable cause existed for its issuance. In any event, even if the warrant was constitutionally infirm under *Carpenter*, suppression would not be the remedy. *See infra* p.10–12; *see also United States v. Wright*, 339 F. Supp. 3d 1057, 1060–62

1170, 1173 (D. Or. 2016) ("The territorial limitation in Rule 41 . . . does not limit warrants issued pursuant to § 2703."). Under the Act, Rule 41 sets forth the "procedures" applied to the issuance of warrants, but the Act also authorizes the issuance of warrants for cell phone location information by "a court of competent jurisdiction," defined throughout the operative provision to include "a State court, issued using State warrant procedures." 18 U.S.C. § 2703(c)(A). It follows that, as the First Circuit recently held, § 2703's "own geographic, jurisdictional limitation" overrides the jurisdictional limits set forth in Rule 41. *United States v. Ackies*, 918 F.3d 190, 202 (1st Cir. 2019).

Finally, even if the Court had agreed with Ortega-Yescas's jurisdictional argument, exclusion would not be warranted. The good-faith exception to the exclusionary rule applies to violations of Rule 41 if "a reasonably well trained officer would [not] have known that the search was illegal in light of all the circumstances." *Henderson*, 906 F.3d at 1118 (quoting *Herring v. United States*, 555 U.S. 135, 145 (2009)); *see also United States v. Elmore*, 917 F.3d 1068, 1077 (9th Cir. 2019) (listing the narrow circumstances in which an officer would know of a search's illegality).

---

(D. Nev. 2018) (applying good faith exception to exclusionary rule for orders clearly barred under *Carpenter*).

"The exclusionary rule was crafted to curb police rather than judicial misconduct." *Herring*, 555 U.S. at 145. Whether a violation of Rule 41 is "fundamental" or merely "technical," "[a]pplication of the good faith exception does not depend on the existence of a warrant, but on the executing officers' *objectively reasonable belief* that there was a valid warrant." *Henderson*, 906 F.3d at 1118. The Ninth Circuit has unequivocally held that the good faith exception applies "where a warrant is void because of a magistrate judge's jurisdictional violation, so long as the executing officers had an objectively reasonable belief that the warrant was valid." *Id.* at 1119.

In this instance, even if Judge Brown had exceeded the limits of his authority, the Task Force was objectively reasonable in its belief that ping monitoring was not illegal under the circumstances. *Herring*, 555 U.S. at 145. Ortega-Yescas does not attempt to argue that the investigators acted in "bad faith." *Henderson*, 906 F.3d at 1119. Nor does he contend that Rule 41(b) could not, consistent with the Constitution, be amended to grant authority to state courts commensurate to that afforded to federal magistrates. The court "see[s] no reason to deter officers from reasonably relying on a type of warrant that could have been valid at the time it was executed . . . ." *Id.* at 1119–20.

The Court will not hold that, as a rule, state court judges cannot issue ping warrants when the underlying charges involve drug activity over interstate lines.

And this case does not involve special circumstances such that the Court could find for Ortega-Yescas and avoid crafting such a rule. In any event, the exclusionary rule would not apply if Judge Brown lacked jurisdiction to issue the warrant. The motion to suppress is denied as to Ortega-Yescas's jurisdictional argument.

## II. Sufficiency of Supplemental Affidavit

Ortega-Yescas alternatively argues that, even if the initial ping warrant was valid, the warrant in place at the time of the Lynwood trip was not because it was not supported by probable cause. The Court disagrees.

A warrant may issue only "upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. A warrant is constitutionally infirm unless: (1) it is issued by a neutral and detached magistrate; (2) it is supported by probable cause; and (3) it describes its object with sufficient particularity. *Dalia v. United States*, 441 U.S. 238, 255 (1979). Ortega-Yescas argues that probable cause did not support the supplemental warrant when the application referred to but did not recite the probable cause statement in the initial application and warrant.

While it is true that the supplemental application did not include those facts supporting probable cause, it expressly incorporated the facts included in the initial warrant—and, again, Ortega-Yescas does not, and could not reasonably, argue that

-12-

the first warrant application does not meet the constitutional requirement of probable cause. In his supplemental application, Cialella referred to the initial warrant, explained his technical error in failing to update the body of the search warrant to extend for 60 days, and certified that the supplemental application was intended to extend the monitoring period for another 46 days, bringing the total number to 60 days. (Doc. 49-2.) Ortega-Yescas has not brought any authority to the Court's attention suggesting that a warrant is invalid because it incorporates by reference the probable cause certification included in an earlier warrant authorizing the search of the same property.

Regardless of the amended warrant's validity, however, the Court must deny the motion to suppress. Suppression is not warranted where, as here, the police officer relied on the issuing judge's legal determination. Suppression is appropriate only where "police conduct [is] sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Herring*, 555 U.S. at 144. "[I]solated negligence" is not enough. *Id.*

To the degree that error occurred, the error is mere "isolated negligence." Agent Cialella mistakenly forgot to replace one instance of the number "14" with the number "60." At the hearing, Cialella testified that the Task Force "[u]sually . . . do[es] pings for a lot longer than 14 days. 60 days is—45 to 60

days, just depending on what we think we're going to get out of it and how long we think we need." (Doc. 63 at 23.) When he realized his mistake, he asked the judge what to do. He relied on that judge's assurance that he need not recertify the facts supporting probable cause. Instead, Cialella simply explained the error and attempted to correct it. Under these innocent circumstances, suppression would neither deter future errors nor further the interests of justice. *Herring*, 555 U.S. at 144.

Accordingly, IT IS ORDERED that the motion (Doc. 47) is DENIED.

DATED this 30th day of May, 2019.

Dana L. Christensen, Chief Judge
United States District Court